OPINION
{¶ 1} Larry J. Fitch appeals from his conviction and sentence on two counts of forcible rape of a child under age thirteen and three counts of attempted rape. The victims of the offenses were his daughters, six-year-old B. F. and eleven-year-old J.F. The trial court sentenced Fitch to an aggregate term of life in prison with parole eligibility after thirty-six years.
 {¶ 2} On May 21, 2002, court-appointed counsel Cozette Snead filed an Anders brief, asserting the absence of any meritorious issues for our review.[1] Thereafter, on August 29, 2002, the public defender's office filed a brief on Fitch's behalf, advancing one assignment of error based on ineffective assistance of counsel. In particular, the public defender's office argues that Fitch's Sixth Amendment rights were violated by trial counsel's (1) failure to object to hearsay testimony, (2) failure to object to certain comments made by the prosecutor, (3) failure to object to expert testimony that vouched for the credibility of B.F.'s sexual-abuse complaint, and (4) decision to admit J.F.'s diary into evidence even though it contained entries prejudicial to Fitch. For the reasons to follow, we find the foregoing arguments to be unpersuasive and affirm the trial court's judgment entry of conviction and sentence.
 {¶ 3} The record reflects that in September, 2001, Fitch and his wife Melynda were living with Melynda's parents at 5752 Urbana Road in Springfield, Ohio. Also residing at that address were the Fitchs' four children (ages six, seven, nine and eleven), Melynda's sister Pamela McCann, and Melynda's brother in law. While living at the home on Urbana Road, Fitch regularly slept in the same bed with one of his children, usually B.F. He testified that he did so because he could not sleep in the same room with Melynda, who insisted on leaving a television turned on.
 {¶ 4} On September 15, 2001, while Fitch and Melynda were away from the house, McCann observed that six-year-old B.F. was distraught and crying. McCann testified that as she consoled the child, B.F. made certain unspecified statements to her.[2] According to McCann, B.F. then remarked that "he" had done "this" to J.F. too.[3] B.F. later repeated her unspecified statements to the family's bishop. In addition, McCann spoke to J.F., who said "no, it didn't happen" to her.[4] At some point, Melynda returned home from work and also talked to B.F. As a result of that conversation, Melynda and McCann contacted Children's Services and took B.F. to the emergency room at Mercy Memorial Hospital for a sexual abuse examination. According to the examining physician, Dr. David Gilbert, B.F. reported that Fitch frequently got into bed with her and felt her groin area through her clothes. She reported that Fitch did not take off her clothes or place his hand inside her panties. She also told the doctor that Fitch usually was wearing underpants, that she did not feel his penis pushing against her, that he had not gotten "wet" to her knowledge, and that he had not tried to make her touch him. B.F. also did not mention any anal or oral contact. Nor did she describe any pain upon urination or otherwise. Dr. Gilbert then examined B.F. by placing her on her back with her legs over the sides of the table. He did not detect any trauma in the vaginal or anal areas. Dr. Gilbert also took cultures and did not detect any blood or other discharge from these areas.
 {¶ 5} Approximately two weeks later, Melynda took B.F. and J.F. to see Dr. James Duffee at the Rocking Horse Child Advocacy Center, which is administered by the prosecutor's or attorney general's office and funded though the Department of Jobs and Family Services and a "Victims of Crime VOCA grant." During this examination, Dr. Duffee spoke with B.F., who stated that Fitch had touched her on her "private" while wearing his pajamas. According to Dr. Duffee, B.F. then reported that "[h]e laid on my back, and it hurt." Dr. Duffee testified that B.F. then touched her stomach and her back to indicate where she had felt the pain. At that point in the examination, the doctor asked B.F. whether she had her pajamas and her underpants off. Dr. Duffee testified that B.F. responded positively. He also asked B.F. where Fitch had put his "private." In response, B.F. stated "here," pointing toward the inside of her leg and her vaginal area. The doctor then asked whether it felt like when she had to "poop." B.F. responded, "Yes." According to Dr. Duffee, B.F. then stated that Fitch brought "cream" into the room. She also indicated that he had placed it on the inside of her leg and in her vaginal area. Dr. Duffee testified that she then stated, spontaneously, "I told him I didn't want to, but he put it there anyway." When the doctor asked whether anything came out of Fitch's "private," B.F. responded "the cream." When asked how many times this had occurred, B.F. first said ten but then changed her answer to twenty. According to Dr. Duffee, she added that "[h]e never listens," and that when she asked Fitch to stop, he said, "Just let me do it." In an effort to determine how many incidents had occurred, the doctor then asked whether B.F. had seen Fitch without clothes on other occasions. In response, B.F. stated that he had washed her in the shower, that she had seen his "private," and that it had been "pointing up."
 {¶ 6} Based on B.F.'s statements, Dr. Duffee elected to conduct a sexual abuse examination on her. While doing so, he placed her in two positions: (1) the "frog-leg" position on her back with her soles of her feet touching and (2) the "knee-chest" position on her knees, chest-down with her bottom in the air. Upon examining B.F.'s vaginal area, the doctor did not detect any signs of sexual abuse. When examining B.F.'s anal area, however, the doctor detected an anal tear. According to Dr. Duffee, the tear was visible only when B.F. was in the knee-chest position. Dr. Duffee described the tear as a "gaping split" about three-quarters of an inch wide and three-quarters of an inch deep. He testified that it exceeded the size of an anal fissure that might be caused by constipation. According to Dr. Duffee, his examination of B.F. was "strongly suggestive of anal penetration." The doctor also testified that the tear could have been missed during the earlier examination at Mercy Memorial Hospital, where B.F. was not examined in the "knee-chest" position.
 {¶ 7} Dr. Duffee testified that he next interviewed eleven-year-old J.F., who reported that Fitch had done "something" to her. According to the doctor, J.F. was "very, very, very anxious" during the interview. While sobbing, she told him that Fitch had taken off his clothes and hers. Dr. Duffee testified that she then stated Fitch had "humped" her. In particular, the doctor testified that she described laying on her stomach with Fitch on top of her pushing hard from behind. Upon additional questioning, J.F. conveyed to the doctor that Fitch had touched his "private" to her "private" in "front" and in "back." According to Dr. Duffee, J.F. told him that Fitch could not get his "private" inside her, despite trying to do so. Dr. Duffee also testified that J.F. reported feeling "wet" on her leg. Finally, the doctor testified that J.F. reported Fitch placing his mouth on her breasts twice one day and once another day. Dr. Duffee did not conduct a sexual abuse examination on J.F. as he believed that she was too tense.
 {¶ 8} On re-direct examination, Dr. Duffee was asked whether he believed, to a reasonable degree of medical certainty, that B.F.'s injury was "caused by sexual abuse by somebody." In response, the doctor stated: "Certainly the validity of her report is very, very high given that injury it is extremely consistent with her naive report of penetration by a penis." (Tr. at 95). Dr. Duffee was then asked whether B.F.'s statements to him were what "link[ed]" Fitch to the incident. The doctor responded: "That's correct. . . . Right. From the psychiatric standpoint looking at the literature about validity, this was a very valid report, meets the criteria that are present within the psychiatric world." (Id. at 96).
 {¶ 9} On re-cross examination as to Dr. Duffee's finding of a "valid" report, defense counsel inquired into whether he had investigated B.F.'s background to assess her naivete or her propensity to lie. After the doctor expressed his belief that such information was not important for his purposes, the following exchange took place:
 {¶ 10} "Counsel: So to determine [the] level of validity, whether the person's known to be a liar is not relevant?"
 {¶ 11} "Dr. Duffee: We're talking about a six-year-old, I would say categorically, first, believe the child.
 {¶ 12} "Counsel: So that's your bias, right?
 {¶ 13} "Dr. Duffee: That's the bias in the — in the child abuse literature, that's exactly right." (Tr. at 101).
 {¶ 14} J.F. also testified at Fitch's trial. On direct examination, she recalled an incident on Saturday, September 8, 2001, when Fitch had her get into B.F.'s bed with him. J.F. stated that Fitch put "cream" on her lower "private" with his "private." She also testified about a second incident, later that Saturday, when Fitch took off his clothes and hers. According to J.F., Fitch "hump[ed]" her by placing his "private" on her "private" while she was on her back and he was on top of her. J.F. stated that on this occasion, the bedroom door was open, and her mother was in a bedroom watching television across the hall with the door closed. J.F. also testified that a third incident occurred the following day in her mother's bedroom while her mother was at work. On that occasion, Fitch and J.F. removed their clothes, and he put lotion on her "lower private." According to J.F., Fitch told her that "it would be easier to let it go in." J.F. testified that she felt pain on her "private," but she was unsure whether any part of Fitch's body ever entered her "private." She also testified that she had written about these incidents in her diary. Finally, J.F. explained that she had not mentioned the incidents when initially questioned by Pamela McCann because she had been afraid.
 {¶ 15} The next witness for the State was B.F., who testified that Fitch used to sleep in her room with her. B.F. also recalled telling McCann that Fitch put his "private" on her "private." According to B.F., this took place in her bed "every night sometimes." She testified that Fitch removed her panties while wearing an undershirt but no underpants himself. She also stated that he put lotion on his "private," and that "something came out" of his "private." Although she told him to stop, he "didn't listen." In addition, B.F. testified that she experienced pain in her side or stomach when Fitch would lay down next to her. She explained that this happened "a lot" and more than twice. B.F. also indicted that she had seen Fitch doing something similar to J.F., although she was not sure where she saw it.
 {¶ 16} On cross examination, defense counsel asked B.F. about her visit to Mercy Memorial Hospital to see Dr. Gilbert. After establishing that she remembered the trip, defense counsel engaged in the following colloquy:
 {¶ 17} "Counsel: And when you talked to him about this, you indicated to him that — that your daddy had touched you on top of your clothes; correct?
 {¶ 18} "B.F.: (Nods head.)
 {¶ 19} "Counsel: Is that true?
 {¶ 20} "B.F.: What?
 {¶ 21} "Counsel: Was that true? Is that the truth? Did you tell him the truth or not?
 {¶ 22} "B.F.: I think. I told him the truth.
 {¶ 23} "Counsel: You told him the truth?
 {¶ 24} "B.F.: (Nods head.)
 {¶ 25} "Counsel: And were you telling him the truth when you said that your daddy doesn't try to make you touch him. Was that the truth?
 {¶ 26} "B.F.: No.
 {¶ 27} "Counsel: Well, what did you tell him?
 {¶ 28} "B.F.: I forget.
 {¶ 29} "Counsel: When you told him that you had not felt your father's private part pushing against you, was that the truth or a lie?
 {¶ 30} "B.F.: Truth, the truth.
 {¶ 31} "Counsel: That was the truth. So that didn't happen?
 {¶ 32} "B.F.: (Nods head.)
 {¶ 33} "Counsel: And when you told the doctor that you did not — that he did does not take off your clothes nor does he put his hand inside your panties, was that the truth or false?
 {¶ 34} "B.F.: No.
 {¶ 35} "Counsel: Was that true or false?
 {¶ 36} "B.F.: No. That wasn't the truth.
 {¶ 37} "Counsel: So you didn't tell him the truth then. Why not?
 {¶ 38} "B.F.: I did tell the truth, but my dad didn't put his hands — he took my underwear off.
 {¶ 39} "Counsel: Okay. Why didn't you tell that to the doctor?
 {¶ 40} "B.F.: Because he did it.
 {¶ 41} "Counsel: So you lied to the doctor, correct?
 {¶ 42} "B.F.: No.
 {¶ 43} "Counsel: No? Did you say anything else incorrect to the doctor that day?
 {¶ 44} "B.F.: I think.
 {¶ 45} "Counsel: Excuse me? I'm really having trouble hearing you. I'm sorry, [B.F.].
 {¶ 46} "B.F.: I think.
 {¶ 47} "Counsel: What do you think?
 {¶ 48} "B.F.: I forget.
 {¶ 49} "Counsel: Okay. Did you tell — do you recall going to the other doctor?
 {¶ 50} "B.F.: Dr. Duffee.
 {¶ 51} "Counsel: Did you tell him anything that was incorrect?
 {¶ 52} "B.F.: Yeah, but I forget.
 {¶ 53} "Counsel: So you did tell him something that was incorrect, but you don't remember what?
 {¶ 54} "B.F.: Yeah. I don't remember what I said from —
 {¶ 55} "Counsel: Okay. So you did tell some things that weren't true, but you don't remember exactly what?
 {¶ 56} "B.F.: I told him the truth, but I forget what it was.
 {¶ 57} "Counsel: Okay. Do you understand the difference between telling the truth and telling something that was incorrect?
 {¶ 58} "B.F.: I don't understand.
 {¶ 59} "Counsel: Well, do you understand that what it is to say something that's incorrect?
 {¶ 60} "B.F.: (Shakes head.)
 {¶ 61} "Counsel: Okay. If I tell you your shirt is purple, that would be correct, right?
 {¶ 62} "B.F.: Yeah.
 {¶ 63} "Counsel: If I tell you you have a red shirt on, that would be incorrect because you have a shirt on, it's not red, right?
 {¶ 64} "B.F.: It's not red.
 {¶ 65} "Counsel: That would be something that's incorrect. When you talked to Dr. Duffee, you told him some things that were incorrect, right?
 {¶ 66} "B.F.: (Nods head.)
 {¶ 67} "Counsel: Do you recall what those things were?
 {¶ 68} "B.F.: I don't remember.
 {¶ 69} "Counsel: Okay. Had you saw — had you saw. Jesus. . . .
 {¶ 70} "* * *
 {¶ 71} "Counsel: Had you talked to other people regarding —
 {¶ 72} "B.F.: My tummy — I told a lot of people —
 {¶ 73} "Counsel: Uh-huh.
 {¶ 74} "B.F.: — Daddy did this.
 {¶ 75} "Counsel: Uh-huh. Did you tell them things that were incorrect?
 {¶ 76} "B.F.: (Nods head.)
 {¶ 77} "Counsel: What was incorrect?
 {¶ 78} "B.F.: I forget.
 {¶ 79} "Counsel: You forget what was incorrect, but something you'd been telling these people is incorrect, right?
 {¶ 80} "B.F.: (Nods head.)"
 {¶ 81} (Tr. at 187-191).
 {¶ 82} On re-direct examination, B.F. testified that she told Dr. Duffee the truth when he examined her at the Rocking Horse Child Advocacy Center. She also testified that her testimony in court was true.
 {¶ 83} Nine-year-old T.F. also testified at trial. On direct examination, he identified a picture that he had drawn while at a counseling center. According to T.F., he had observed what the picture depicted, namely Fitch and B.F. in bed together naked. T.F. explained that Fitch was kneeling in the picture and B.F. was laying down.
 {¶ 84} After the State rested, Fitch testified on his own behalf. He stated that in 2000 or early 2001, Melynda became angry with him while they were residing in Arizona. According to Fitch, her anger resulted in her taking B.F. to a hospital in Arizona and making unfounded sexual abuse allegations against him there. Fitch stated that no charges were filed in Arizona despite the allegations. Thereafter, in February, 2001, he moved back to Ohio with his family and began living with Melynda's parents. Fitch testified that shortly before his arrest in 2001, he discovered that his wife had a boyfriend and that she had been denied admission to nursing school because she was taking cocaine. Fitch also stated that on September 15, 2001, the day B.F. first told Pamela McCann about being sexually abused, Melynda had him arrested on a baseless domestic violence report that has not resulted in any charges being filed.
 {¶ 85} Fitch next denied having had any sexual contact with his children. With respect to the allegations made against him, he suggested that his children were being coached by Melynda and other family members. He also suggested the anal tear detected by Dr. Duffee may have occurred while he was in jail on the sexual abuse charges. In addition, he expressed his own opinion that it may have been caused by bicycle riding or constipation. With respect to the picture that T.F. claimed to have drawn, Fitch asserted that someone else drew it for the child. On cross-examination, the prosecutor asked Fitch about the diary entries that J.F. had testified about making. In particular, the prosecutor asked him about entries stating that she and Fitch "did it today," "did it twice," and "did it again today." Fitch examined the diary and insisted that the handwriting was not his daughter's.
 {¶ 86} As noted above, the jury ultimately convicted Fitch on two counts of forcible rape involving B.F. and three counts of attempted rape involving J.F. Following sentencing, he filed a timely notice of appeal. In his sole assignment of error, he alleges ineffective assistance of trial counsel based on counsel's (1) failure to object to hearsay testimony, (2) failure to object to certain comments made by the prosecutor, (3) failure to object to expert testimony that vouched for the credibility of B.F.'s sexual-abuse complaint, and (4) decision to admit J.F.'s diary into evidence even though it contained entries prejudicial to Fitch.
 {¶ 87} Upon review, we find Fitch's assignment of error to be unpersuasive. It is well settled that "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." State v.Bradley (1989), 42 Ohio St.3d 136, 137, paragraph two of the syllabus, following Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674. Further, "[t]o show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Bradley, supra,, at paragraph three of the syllabus.
 {¶ 88} In the present case, Fitch has not demonstrated ineffective assistance of counsel based on counsel's failure to object to hearsay testimony. Fitch first challenges Pamela McCann's testimony that "[B.F.] had said that he had done this to [J.F.] too." As noted by the State, however, this testimony is not hearsay because it was not offered for the truth of the matter asserted, but to explain why McCann brought J.F. upstairs to question her. In any event, J.F. herself later testified that Fitch had sexually abused her too. Consequently, we would find no prejudice to Fitch from McCann's testimony even if it were inadmissible hearsay.
 {¶ 89} We also reject Fitch's argument that his trial counsel provided ineffective assistance by objecting to hearsay testimony that was favorable to his defense. At trial, McCann testified that J.F. had denied being abused by Fitch. Surprisingly, defense counsel objected to this testimony on the basis of hearsay. We note, however, that J.F. herself later testified about her initial denial of being abused by Fitch. She explained that she denied the abuse because she was afraid. Consequently, we find no prejudice to Fitch as a result of his attorney's objection.
 {¶ 90} Fitch also challenges Dr. Duffee's testimony that B.F. described his penis as "pointing up" when she showered with him on one occasion. According to Fitch, this testimony constituted inadmissible hearsay. Upon review, however, we agree with the State that competent defense counsel reasonably could have believed that this testimony was admissible under Evid.R. 803(4), which provides that statements made for purposes of medical diagnosis or treatment are not hearsay. At trial, Dr. Duffee explained that he interviewed B.F. to assist him in making an accurate diagnosis. During the interview, he asked "generally if she had seen [Fitch] without any clothes" on occasions other than those she already had mentioned. He asked this question to help determine how many times she had been sexually abused. In response, B.F. told him that she had seen Fitch in the shower. When B.F. also indicated that she had seen Fitch's "private" in the shower, Dr. Duffee asked about its appearance. B.F. told him that it was "pointing up." Based on this comment and B.F.'s other statements, Dr. Duffee concluded that Fitch may have ejaculated. Therefore, he elected to proceed with cultures and a full physical examination.
 {¶ 91} Given the context of the foregoing testimony, defense counsel reasonably could have concluded that the challenged remarks were admissible under Evid.R. 803(4). Therefore, defense counsel did not provide deficient representation by failing to object. Furthermore, we find no reasonable probability that, but for the failure to object, the result of Fitch's trial would have been different. Consequently, we find no ineffective assistance of counsel on the basis of defense counsel's failure to object.
 {¶ 92} We also find no ineffective assistance of counsel based on counsel's failure to object to certain comments made by the prosecutor. Fitch first challenge's the prosecutor's statement, during closing arguments, that "we know where he penetrated her because of that anal tear." Fitch contends that the this remark was an improper mischaracterization of Dr. Duffee's testimony. Upon review, however, we believe that it constituted proper argument. The State's theory was that Fitch had engaged in anal sex with B.F. Although the tear and Dr. Duffee's testimony about it did not compel such a conclusion, the State's argument to that effect was proper in light of the evidence presented at trial.
 {¶ 93} We also reject Fitch's argument that his attorney provided ineffective assistance by failing to object when the prosecutor vouched for the credibility of B.F. and J.F. and appealed to the sympathy of the jury. During his closing argument, the prosecutor stated:
 {¶ 94} "But these kids came into this big room, bunch of strangers, scary environment for them, had to face their dad; and they mustered up enough courage to do that to come in here and tell you what happened.
 {¶ 95} "And you had the opportunity to observe them, to examine their demeanor, their veracity; and I would submit to you that they came in here, and they told you the truth. And they did that with an awful lot of courage.
 {¶ 96} "And on behalf of them, on behalf of the State of Ohio, I'm asking you to not let them down, to find this man guilty of what he's done; and that is raping and attempting to rape his very own daughters." (Tr. at 343-344).
 {¶ 97} With respect to Fitch's argument regarding vouching, the prosecutor came close to offering his own opinion about the credibility of B.F. and J.F. Although a prosecutor may argue that the evidence suggests a witness is truthful, a prosecutor may not offer a personal evaluation about whether a witness is truthful. State v. Herring, 94 Ohio St.3d 246,261, 2002-Ohio-796. In the present case, the prosecutor's use of the words "I would submit" when arguing the honesty of B.F. and J.F. was ill-advised. Nevertheless, this "submission" by the prosecutor appears to have been based on the behavior and demeanor of the two children on the witness stand, rather than his own personal opinion. At a minimum, competent defense counsel reasonably could have believed that the argument by the prosecutor was permissible. Consequently, we find no deficient representation, and therefore no ineffective assistance, based on counsel's failure to object to it.
 {¶ 98} We reach a somewhat different conclusion, however, with respect to the prosecutor's request that the jury not "let down" B.F. and J.F. In our view, such an appeal to the jury's emotions was inappropriate, and defense counsel should have objected to it. Counsel's failure to do so constituted deficient performance under Bradley andStrickland. In order to sustain Fitch's assignment of error, however, we also must find prejudice, i.e., a reasonable probability that, but for counsel's error, the result of the trial would have been different. Given the strength of the evidence against Fitch and the isolated nature of the prosecutor's remark, we find it extremely improbable that the result of the trial would have been different if defense counsel had objected. Consequently, we find no prejudice and, therefore, no ineffective assistance of counsel based on the absence of objections to the prosecutor's remarks.
 {¶ 99} Fitch next alleges that his attorney provided ineffective assistance by failing to object when Dr. Duffee impermissibly vouched for the credibility of B.F. As noted above, Dr. Duffee was asked on re-direct examination whether he believed, to a reasonable degree of medical certainty, that B.F.'s injury was "caused by sexual abuse by somebody." In response, the doctor stated: "Certainly the validity of her report is very, very high given that injury it is extremely consistent with her naive report of penetration by a penis." Dr. Duffee was then asked whether B.F.'s statements to him were what "link[ed]" Fitch to the incident. The doctor responded: "That's correct. . . . Right. From the psychiatric standpoint looking at the literature about validity, this was a very valid report, meets the criteria that are present within the psychiatric world." Finally, on re-cross examination as to Dr. Duffee's finding of a "valid" report, defense counsel inquired into whether he had investigated B.F.'s background to assess her naivete or her propensity to lie. After the doctor expressed his belief that such information was not important for his purposes, the following exchange took place:
 {¶ 100} "Counsel: So to determine [the] level of validity, whether the person's known to be a liar is not relevant?"
 {¶ 101} "Dr. Duffee: We're talking about a six-year-old, I would say categorically, first, believe the child.
 {¶ 102} "Counsel: So that's your bias, right?
 {¶ 103} "Dr. Duffee: That's the bias in the — in the child abuse literature, that's exactly right."
 {¶ 104} On appeal, Fitch argues that the foregoing statements by Dr. Duffee constituted improper vouching for B.F.'s credibility. He also argues that his attorney's failure to object to the doctor's testimony constituted deficient representation and resulted in severe prejudice. This argument implicates State v. Boston (1989), 46 Ohio St.3d 108, wherein the Ohio Supreme Court held that an expert witness may not testify that a child sexual abuse victim is telling the truth. More recently, in State v. Stowers, 81 Ohio St.3d 260, 1998-Ohio-632, the court clarified, however, that Boston does not prohibit an expert from conveying his belief that a complaining child was sexually abused. Id. at 261. Nor does Boston proscribe expert testimony that "is additional support for the truth of the facts testified to by the child, or which assists the fact finder in assessing the child's veracity." Id. at 262. Thus, in Stowers, the Ohio Supreme Court permitted expert testimony that certain behavior by the child victims was consistent with general behavioral characteristics seen in sexually abused children. Id. at 263.
 {¶ 105} With the foregoing considerations in mind, we turn now to Dr. Duffee's testimony regarding B.F.'s complaint. As noted above, the doctor first opined that "the validity of her report is very, very high given that injury it is extremely consistent with her naive report of penetration by a penis." Dr. Duffee appears to have been suggesting that B.F.'s sexual abuse complaint was particularly credible because of the nature of her injury and the naive or childlike (i.e., non-coached) way she described the sexual activity. Consistent with Boston and Stowers, Dr. Duffee was free to offer expert testimony that sexual abuse is more likely to exist when a child's injury is consistent with her complaint and when the child describes the abuse in a naive way. Such testimony is admissible under Stowers, as it assists the fact finder in assessing the child's credibility. In the present case, however, Dr. Duffee's testimony went a bit further. He also expressed his belief that the "validity" of B.F.'s report was "very, very high[.]" Under Boston, we believe that this determination should be left to the jury alone. While it was permissible for Dr. Duffee to provide the jury with factors or criteria to consider when assessing B.F.'s credibility,[5] he should not have characterized her complaint as highly valid. Rather, he should have informed the jury of the relevant factors to consider when assessing credibility, indicated whether he found the factors present, and allowed the jury to draw its own conclusion on the issue of B.F.'s veracity.
 {¶ 106} We reach a similar conclusion with respect to Dr. Duffee's testimony that "[f]rom the psychiatric standpoint looking at the literature about validity, this was a very valid report," and that B.F.'s complaint "meets the criteria that are present within the psychiatric world." In light of Boston and Stowers, the doctor was free to identify any psychiatric criteria that might have been useful to the jury in assessing the validity of B.F.'s sexual abuse complaint.[6] He also was free to explain the presence or absence of the criteria in B.F.'s case. However, we believe, once again, that he should not have characterized her report as "very valid."
 {¶ 107} Finally, concerning his failure to investigate B.F.'s truthfulness or lack thereof, Dr. Duffee stated: "We're talking about a six-year-old, I would say categorically, first, believe the child." In explaining this position, he added that "the literature" supports a bias toward believing complaints made by a child. Although Dr. Duffee failed to identify any particular literature endorsing such a bias, we find no violation of Boston stemming from this testimony. In essence, the doctor provided expert testimony that abuse complaints by a child generally are valid, hence the bias toward believing the child. Although the accuracy of this assertion is open to debate, Dr. Duffee's statement did not constitute his personal opinion as to the veracity of B.F.'s complaints.
 {¶ 108} Nevertheless, given that Dr. Duffee twice crossed the line drawn by the Ohio Supreme Court in Boston, we find that defense counsel provided deficient representation by failing to object to portions of his testimony. As we have recognized, however, Fitch also must demonstrate that counsel's deficient performance resulted in prejudice. In other words, he must show a reasonable probability that, but for his attorney's error, the result of the trial would have been different. Once again, given the strength of the evidence against Fitch and the limited nature of the Boston violation, we seriously doubt that the result of the trial would have been different if defense counsel had objected to Dr. Duffee's testimony.[7] As a result, we find no prejudice and, therefore, no ineffective assistance of counsel based on the absence of objections to the doctor's objectionable statements.
 {¶ 109} Finally, we find no ineffective assistance of counsel based on defense counsel's decision to have J.F.'s diary admitted into evidence. On appeal, Fitch argues that his attorney should not have offered the diary for admission into evidence, as it contained entries that were damaging to him. In particular, he notes the existence of entries stating that he "had sex" with J.F., and that he "did it" with her. Upon review, we find Fitch's argument to be unpersuasive. The content of these entries was revealed by J.F. during her trial testimony. As a result, admitting the diary into evidence did not provide the jury with any new information that was damaging to Fitch. In addition, we note that two of the relevant entries were located in the back of the diary, away from all others and out of chronological order. In light of this fact, a competent defense attorney might have wanted the jury to see the diary. Indeed, Fitch's attorney reasonably may have believed that the jury would question the credibility of the damaging entries after observing their location relative to the other entries in the diary. Consequently, we cannot say that defense counsel provided deficient representation in admitting the diary into evidence.
 {¶ 110} Based on the reasoning and citation of authority set forth above, we find Fitch's sole assignment of error to be unpersuasive. The record fails to demonstrate that he received ineffective assistance of trial counsel. Accordingly, we overrule his assignment of error and affirm the judgment of the Clark County Court of Common Pleas.
Judgment affirmed.
WOLFF, P.J., and GRADY, J., concur.
[1] Although counsel expressed her inability to advance any non-frivolous assignments of error, she did identify three potential issues for our review: (1) unspecified ineffective assistance of trial counsel; (2) guilty verdicts against the manifest weight of the evidence; and (3) unspecified erroneous evidentiary rulings. After setting forth these potential issues, counsel opined that they did not constitute meritorious grounds for relief on appeal. We agree. Having reviewed the record in its entirety, we conclude that Fitch's convictions clearly are not against the manifest weight of the evidence. Likewise, as we will explain more fully, infra, we do not believe that Fitch received ineffective assistance of trial counsel. Nor do we believe that any erroneous evidentiary rulings warrant the reversal of Fitch's convictions.
[2] Defense counsel objected on the basis of hearsay when the prosecutor asked McCann what B.F. said to her. The trial court sustained the objection.
[3] Defense counsel did not object to this testimony. Presumably, this statement by B.F. related to sexual abuse committed by Fitch, but the record does not so indicate.
[4] Although this testimony was favorable to Fitch, defense counsel objected to it on the basis of hearsay, and the trial court sustained the objection.
[5] In State v. McMahon, Clark App. Nos. 94-CA-49 and 94-CA-50 (April 12, 1996), we held that Dr. Duffee violated Boston by testifying about specific criteria in the psychiatric literature that lend credibility to a child's report of sexual abuse. In light of the Ohio Supreme Court's subsequent decision in Stowers, however, we now conclude that such testimony is permissible, as it assists the trier of fact in assessing a child's credibility.
[6] Parenthetically, we note that Dr. Duffee failed to identify any specific "criteria" found in "the literature."
[7] In reaching this conclusion, we note that our analysis herein is not inconsistent with our recent decision in State v. Kovac, Montgomery App. No. 18662, 2002-Ohio-6784. In Kovac, we reversed the defendant's conviction on the basis of a Boston violation. In that case, however, defense counsel objected to the challenged testimony, and we considered whether the violation was harmless beyond a reasonable doubt, ultimately concluding that it was not. In the present case, defense counsel did not object, and the Boston violation comes before us in the context of an ineffective assistance of counsel claim. In that context, the question is whether Fitch has shown a reasonable probability that, but for his attorney's error, the result of his trial would have been different. Based on the substantial evidence against Fitch, we conclude that he has failed to make such a showing.